Donald E. CESNIK and Clarence C. Griffith, Jr., Plaintiffs,

v.

CHRYSLER CORPORATION, Fedders Corporation and Airtemp Corporation, Defendants.

No. 77–3313.

United States District Court,
M. D. Tennessee,
Nashville Division.

May 6, 1980.

H. Frederick Humbracht, John R. Edwards, Robert J. Warner, Jr., Nashville, Tenn., for plaintiffs.

James O. Bass, Jr., Gerard Thomas Nebel, Nashville, Tenn., for Chrysler.

Dick Lansden, Nashville, Tenn., Lawrence Weiss, New York City, for Fedders and Airtemp.

## MEMORANDUM

WISEMAN, District Judge.

In 1976 the defendants Chrysler Corporation and Fedders Corporation entered into a contract whereby Chrysler would sell the assets of its Airtemp Division to Fedders. After the sale, Airtemp Division became Airtemp Corporation, a wholly-owned subsidiary of Fedders, and the third named defendant in this action.[1] The plaintiffs

---

1. The Court perceives no reason to distinguish the potential liabilities of Fedders and its subsidiary, Airtemp Corporation. The evidence established that Fedders was in total control of Airtemp Corporation, and thus Airtemp agents were also Fedders agents. Consequently, the Court will treat Airtemp and Fedders as a single defendant, referred to jointly as Fedders.

maintain that, as part of this transaction, Chrysler and Fedders also agreed that Chrysler would not rehire any of its former Airtemp managerial employees who refused employment by Fedders. As former Airtemp managers who refused employment with Fedders and who were then unable to obtain new employment with Chrysler, the plaintiffs assert in Count I of their two count complaint that the agreement between Chrysler and Fedders violated section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), in that the agreement restrained competition for the services of these employees. The Court's jurisdiction over Count I is based on 15 U.S.C. § 15, as well as 28 U.S.C. § 1331(a).

The plaintiffs have also stated a claim under state tort law in Count II, alleging that the defendants' agreement tortiously interfered with the plaintiffs' employment relationships with Chrysler. The Court's jurisdiction over this count is independently based on diversity of citizenship. 28 U.S.C. § 1332(a), (c).

## I. THE FACTS

The only factual issue before the Court is whether there was an agreement between Chrysler and Fedders that Chrysler would not rehire any of its former Airtemp Division managerial employees who refused employment with Fedders. The parties have stipulated that on February 23, 1976, Chrysler and Fedders executed an agreement for the sale of Airtemp Division's non-automotive assets to Fedders, and Fedders formed Airtemp Corporation to receive part of those assets, including Chrysler's facilities in Bowling Green, Kentucky, where the plaintiffs were employed by Chrysler. The defendants acknowledge that during the course of contract negotiations, Chrysler and Fedders discussed the transfer of Chrysler employees to Fedders. The parties further stipulate that Fedders agreed to make offers to the managerial employees

of the Bowling Green plant, and that on or about March 9, 1976, Fedders, through its Airtemp Corporation, made employment offers to the plaintiffs. Mr. Cesnik never accepted employment with Fedders, while Mr. Griffith withdrew his acceptance of Fedders' employment. Finally, it is agreed that Chrysler formally terminated the plaintiffs on or about April 9, 1976.

As for the disputed issue, the Court finds that between December 18, 1975, and February 23, 1976, the defendants made an agreement that Chrysler would dismiss all of its managerial employees in the Airtemp Division, and Fedders would make offers of employment to those individuals.[2] At Fedders' suggestion and insistence, Chrysler agreed not to rehire any employees whom it discharged and who failed to accept Fedders' employment offer. This finding is based on the testimony of Matthew Bolin, former president of Chrysler's Airtemp Division who later became the president of Fedders Airtemp Corporation; William Blakeslee, a vice-president of Chrysler Corporation; Roger Helder, vice-president and controller of Chrysler; Victor Tomlinson, a senior attorney for Chrysler; Sam Muscanera, house counsel for Fedders and Airtemp Corporation; and, of course, the testimony of the plaintiffs, Mr. Cesnik and Mr. Griffith.

Mr. Bolin testified through his deposition that he attended a meeting with Fedders' representatives on December 18, 1975, during which the group discussed the agreements between Chrysler and Fedders relating to the sale of Airtemp's assets. The agreements were subsequently embodied in a memorandum drafted by William Blakeslee on December 22, which outlined the agreements between Chrysler and Fedders.[3] That memorandum contained the explicit statement, identified as Item No. 8, that: "Chrysler will not offer employment to any Airtemp employee that Fedders wants to

---

**2.** Exhibit FA1; testimony of Sam Muscanera; Exhibit 1; Exhibit 3.

**3.** Exhibit 1.

hire but refuses to work for Fedders." Mr. Bolin testified to the existence of that agreement, and indicated that the agreement was not modified at the December 18 meeting, nor was he aware of any changes in the agreement after that date.

Mr. Blakeslee, the author of the memorandum, testified about the December 18 meeting, and that he reviewed with the representatives of Chrysler and Fedders the items that had been discussed, including the agreement at issue. He further testified that, to his knowledge, the agreement was never modified by either party. Mr. Blakeslee understood that this agreement was the result of the negotiations, and he was quite certain that the agreement prohibited the rehiring of Chrysler employees such as the plaintiffs. Roger Heldin, vice-president and controller of Chrysler, was also present at the December 18 meeting, and his testimony directly supported Blakeslee's. Victor Tomlinson, Chrysler's senior attorney, was yet another participant at the December 18 meeting, and his memorandum of December 19[4] also referred to the agreement which became Item No. 8 of the Blakeslee memorandum. His understanding of the agreement's effect was also the same as Blakeslee's, i. e., that the agreement prevented Chrysler from rehiring individuals in the position of the plaintiffs.

Sam Muscanera, house counsel for Fedders and Airtemp Corporation, testified for Fedders, and related his involvement in the drafting of the sale of assets contract.[5] Significantly, the final written contract did not contain the agreement at issue; more significantly however, Muscanera testified under cross-examination that the agreement was omitted from the written agreement for "employee morale purposes."

This admission strongly suggests that the omission from the written agreement did not nullify its existence in fact.

The plaintiffs' own experience further persuades the Court of the agreement's existence. Mr. Bierman, the manager-administrator of Airtemp Corporation,[6] informed both plaintiffs that Chrysler would not rehire employees who refused to work with Fedders, and in fact both plaintiffs were unable to gain reemployment with Chrysler.[7] Specifically, it was Matthew Bolin, the former president of Airtemp Division who became president of Airtemp Corporation, who notified both plaintiffs that Chrysler would not rehire them if they accepted employment with Fedders.[8]

Although the testimony of any one witness might not have been persuasive, as a whole the testimony of all the witnesses persuades the Court that the alleged agreement existed. Therefore, the Court finds that Chrysler and Fedders did agree that Chrysler would not rehire any of its former managerial employees who refused Fedders employment, and the agreement was in fact invoked against the plaintiffs. The Court will not address issues relating to damages, however, because of the further conclusion that the agreement was not illegal.

## II. SHERMAN ANTITRUST CLAIM

The Court has found that Chrysler and Fedders agreed that Chrysler would not reemploy any of its former Airtemp Division managerial employees who had been offered employment by Fedders. The plaintiffs' theory is that this agreement created an unreasonable restraint on competition between Fedders and Chrysler for the services of the former Airtemp Division employees, in violation of section 1 of the

4. Exhibit 3.

5. Exhibit FA1.

6. Given the fact that Airtemp Corporation was a wholly-owned subsidiary of Fedders with interlocking directorates, the Court finds that Bierman acted as an agent for Fedders. The written contract (Exhibit FA1) specifically provided that Fedders controlled Airtemp Corporation, including its officers and employees.

7. There is evidence that Chrysler offered reemployment after the complaint in this case was filed, but that evidence would be relevant only in regard to the issue of damages, which this Court will not address.

8. Deposition of William Bolin 31–32. The Court also finds that Bolin was an agent for Fedders. *See* note 6, *supra*.

Sherman Act. Before the merits of that claim may be addressed, however, the plaintiffs must show that they have standing to litigate their Sherman Act claim. The question of standing presents a number of related issues, which this Court will now address.

### A. Standing

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . ." The Sixth Circuit applies a two-pronged test for standing in antitrust cases, a test derived from *Association of Data Process Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). *See Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142, 1151–52 (6th Cir. 1975). The first prong requires the plaintiff to allege that the defendant caused him injury in fact; the second prong requires that the plaintiff's interest be within the zone of interests that the statute (in this case, section 1 of the Sherman Act) protects or regulates.

■ The plaintiffs have satisfactorily alleged an injury in fact, in that the agreement between the defendants deprived them of a realistic employment opportunity. There is, however, a legal question as to whether the loss of an employment opportunity qualifies as an injury "to business or property" in the sense required in order for a plaintiff to have standing under section 4 of the Clayton Act. In *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), the Supreme Court apparently recognized that the deprivation of a work opportunity is an injury to business or property within the meaning of section 4. *See Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172, 1176 (5th Cir. 1976). *See also* P. Areeda & D. Turner, *Antitrust Law*, § 338(c) (1978). In *Radovich*, a professional football player claimed that the NFL had blacklisted him from employment opportunities in that league, pursuant to an agreement among the member teams. The Court held that his complaint stated a cause of action under section 4 of the Clayton Act. Although the Court did not expressly state that the loss of employment opportunity was an injury to business or property under section 4, that implication is inescapable, and this Court will therefore hold that the plaintiffs in this case have satisfied the "injury to business or property" requirement of section 4.

■ Although the relevant case law is not entirely lucid, this Court also concludes that the plaintiffs have satisfied the second prong of the standing test, and that their interests in employment are within the zone of interests protected by section 1 of the Sherman Act. In other words, alleged restraints on competition for the services of these employees are a form of "restraint on trade or commerce among the several states" under section 1 of the Sherman Act. The most significant Supreme Court authority for this conclusion is the 1926 case of *Anderson v. Shipowners Association*, 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298 (1926). The plaintiff in that case was a West Coast seaman who sued an association of shipowners and operators that controlled maritime employment along the Pacific Coast. The complaint alleged that the Association's rigorous regulations governing the appointment of seamen constituted a restraint of trade or commerce. The Court held that the complaint was sufficient to state a cause of action under the Sherman Act, because the regulations prevented the free exercise of the rights of both the shipowners and the seamen to engage in trade and commerce. 272 U.S. at 363, 47 S.Ct. at 126, quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). In light of *Anderson*, this Court must conclude that the market for employee skills is a market subject to the provisions of the Sherman Act. *See also Mackey v. National Football League*, 543 F.2d 606, 617–18 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977) (holding that the market for football players' services is within the ambit of the Sherman Act); *Quinonez v. National Association of Securities Dealers*, 540 F.2d 824, 828–29 (5th Cir. 1976) (restraints on movement of labor force in securities industry).

The defendants maintain that section 6 of the Clayton Act, 15 U.S.C. § 17, which states that "[t]he labor of a human being is not a commodity or article of commerce" bars the plaintiffs from asserting their Sherman claim. This Court, however, will follow the lead of numerous other courts that have concluded that section 6 applies only to labor unions and agricultural labor. *E. g., Mackey v. National Football League*, 543 F.2d 606, 617–18 (8th Cir. 1976). This conclusion is suggested by the heading of section 6 itself: "Antitrust laws not applicable to labor organizations." More significantly, the Supreme Court's discussion of the origins of section 6 in *Allen Bradley Co. v. Local 3, International Brotherhood of Electrical Workers*, 325 U.S. 797, 803–05, 65 S.Ct. 1533, 1537–38, 89 L.Ed. 1939 (1944) clearly states that the purpose of section 6 was to protect labor unions. Accordingly, this Court rejects the defendants' argument that section 6 bars the plaintiffs' suit.

The defendants have disputed the issue of whether the alleged restraint affected interstate commerce as required by the Sherman Act, but this Court finds that *Anderson, supra,* controls on that point. The *Anderson* court found an effect on interstate commerce in that the Association's employment requirements restrained the shipowners and operators in the way they carried on their interstate business. Similarly, the agreement in this case prevented Chrysler from conducting its interstate business according to its "own choice and discretion," 272 U.S. at 365, 47 S.Ct. at 127, in that Chrysler was precluded from employing a certain group of employees that it otherwise might have employed. Obviously this impact on interstate commerce is not great, but in light of the Supreme Court's view that the Sherman Act goes "to the utmost extent of [Congress'] constitutional power," *United States v. South-Eastern Underwriters Association*, 322 U.S. 533, 558, 64 S.Ct. 1162, 1176, 88

L.Ed. 1440 (1944), this Court is satisfied that the jurisdictional requirement of an impact on interstate commerce has been met.

### B. *Merits of the Sherman Act Claim*

Having concluded that the plaintiffs have standing to bring this lawsuit under the antitrust laws, the question then becomes whether the facts, as developed at trial, show a violation of section 1 of the Sherman Act. The Court finds that the defendants' agreement was not a per se violation, nor was it a violation under the rule of reason.

### 1. Per Se Violation

Plaintiffs have strongly maintained that the defendants' agreement amounted to a group boycott of the former Airtemp employees and was therefore a per se violation of section 1. The plaintiffs rely on such cases as *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), and *Fashion Originators' Guild of America, Inc. v. F. T. C.,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

Although this Court has some reservations about characterizing the defendants' agreement as a concerted refusal to deal with the plaintiffs,[9] the Supreme Court's language in the recent case of *St. Paul Fire & Marine Insurance Co. v. Barry,* 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978) is persuasive, if not controlling. In holding that an agreement between four insurance companies that three of the companies would not deal with customers of the fourth was a boycott under the antitrust laws, the Court stated "[t]he enlistment of third parties in an agreement not to trade, as a means of compelling capitulation by the boycotted group, long has been viewed as conduct supporting a finding of unlawful boycott." 438 U.S. at 544–45, 98 S.Ct. at 2932. The agreement in the instant case fits that definition, since Chrysler, the "third party" for the purposes of the defini-

---

9. The terms "group boycott" and "concerted refusal to deal" will be used interchangeably. *See* Bauer, *Per Se Illegality of Concerted Refus-* *als to Deal: A Rule Ripe for Reexamination,* 79 Colum.L.Rev. 685 (1979).

tion, agreed not to trade with its former employees so that they would "capitulate" to employment with Fedders. Therefore, this Court will assume that the agreement must be dealt with as a group boycott.

The attachment of the group boycott label does not necessarily require as a consequence an application of the per se approach, however. As Professor Bauer noted in his recent commentary, *Per Se Illegality of Concerted Refusals to Deal: A Rule Ripe for Reexamination*, 79 Colum.L.Rev. 685, 692 (1979), the Supreme Court hinted in *St. Paul* that not all group boycotts require application of the per se rule. Justice Powell's "hint" was this statement: "But the issue before us is whether the conduct in question involves a boycott, not whether it is per se unreasonable." 438 U.S. at 542, 98 S.Ct. at 2930. Professor Bauer also suggests that the Supreme Court's abandonment of the per se rule for all vertical territorial and customer restraints in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), provides reason to believe that the per se doctrine in regard to group boycotts may soon be the subject of reexamination and modification by the Court. Bauer, *supra*, at 386. Although the Supreme Court has consistently held in the group boycott cases before it that the alleged restraints at issue were illegal per se, Bauer, *supra*, at 691 n.35, lower courts have avoided application of the per se rule in refusal to deal cases that can be readily distinguished from the Supreme Court cases. *E. g., Neeld v. National Hockey League*, 594 F.2d 1297 (9th Cir. 1979); *Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C.Cir.1978); *Mackey v. National Football League*, 543 F.2d 606 (8th Cir. 1976); *Joseph E. Seagram & Sons v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). Thus, in the absence of any Supreme Court cases based on facts similar to those of this case, this Court will not accept the proposition that any conduct that can be characterized as a group boycott is a per se violation.

This Court will adopt the Ninth Circuit's approach for determining the applicability of the per se doctrine. In *Neeld v. National Hockey League*, 594 F.2d 1297 (9th Cir. 1979), a case recently cited with approval by the Sixth Circuit in *Byars v. Bluff City News Co.*, 609 F.2d 843, 860 (6th Cir. 1979), the court recognized that not all concerted action is judged by the rule of per se illegality. 594 F.2d at 1299. The per se approach is appropriate only when a court is dealing with "naked restraints of trade with no purpose except stifling of competition," *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). The Ninth Circuit cited *Northern Pacific Railroad Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), in reasoning that certain agreements are per se violations "because of their pernicious effect on competition and lack of any redeeming virtue." Thus, the proper inquiry in determining per se applicability is "whether the motive behind the concerted action or the direct effect of the action or both is anti-competitive." *Neeld*, 594 F.2d at 1298–99 n.3. The court then applied its test and determined that a NHL by-law that prohibited the employment of one-eyed hockey players was not a per se violation.

Turning to this case, the Court finds that the stifling of competition was not the purpose of the agreement between the defendants. The agreement was designed to increase the likelihood that Fedders would enjoy the services of the experienced Airtemp employees, an obviously sound business purpose.[10] To the extent that the agreement effectively restrained competition between Chrysler and Fedders for employee services, a competition whose existence is entirely conjectural, that effect was

---

**10.** The Court recognizes that the defendants' legitimate motive would not save an otherwise unlawful agreement, *see Associated Press v. United States*, 326 U.S. 1, 16, n.15, 65 S.Ct. 1416, 1423, 89 L.Ed. 2013 (1945), but the defendants' motive is certainly relevant in determining whether the alleged restraint was indeed unlawful. See *Neeld, supra*, 594 F.2d at 1298–1300.

incidental as well as de minimis. This Court might find a "direct affront to competition," *Neeld, supra,* 594 F.2d at 1300, had the defendants, for example, entered into this agreement for the sole purpose of holding down employment costs. However, this agreement possessed the virtue of helping Fedders secure trained employees who could carry on the business with minimal disruption. In a case such as this, when there was no anti-competitive motive and the anti-competitive effect was incidental, this Court will not apply the per se doctrine.

In a very recent case, *Las Vegas Sun, Inc. v. Summa Corp.,* 610 F.2d 614 (9th Cir. 1979), the Ninth Circuit followed *Neeld* in refusing to apply the per se approach under circumstances bearing certain similarities to this case. The plaintiff in *Las Vegas Sun* was a newspaper that claimed the defendants, a group of corporations and individuals who ran hotel-casinos, had conspired to withdraw their newspaper advertising from the plaintiffs' paper. The court accepted the district court's findings that the defendants had terminated its advertising for legitimate business considerations, and had only an insignificant effect on the paper's business. Having accepted those findings, the Ninth Circuit refused to apply the per se doctrine, 610 F.2d at 619, and applied the rule of reason.

The case is significant because, like the instant case, the plaintiff was a seller who claimed that the defendants had conspired not to buy from him. The Ninth Circuit refused to apply the per se rule because of the legitimate business motives for the agreement, as well as the insignificant effect on the plaintiff's business. Likewise, the agreement in the instant case was motivated by legitimate business motives, and the effect on the plaintiffs was insubstantial. Indeed, the most significant impact on the plaintiffs was their inability to lease

Chrysler cars at attractive rates after the termination of their Chrysler employment. Moreover, like the defendants in *Las Vegas Sun,* Chrysler and Fedders did not exercise sufficient market power to harm the defendants significantly. After all, the agreement at issue only precluded the defendants from selling their services to one particular corporation, Chrysler. This Court accepts Professor Bauer's position that "courts should be less disposed to apply the per se rule where the defendant's share of the market is small," Bauer, *supra,* at 705, a position arguably supported by the Ninth Circuit in *Las Vegas Sun.*[11]

Therefore, because of the lack of anti-competitive intent, the lack of a direct and significant effect on competition, and in light of the defendants' relatively slight power over the market for employee services, this Court will not apply the per se doctrine of illegality.

### 2. Rule of Reason

Having rejected the applicability of the per se doctrine, the Court must now analyze the agreement under the rule of reason. *See National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). In order to establish that an alleged restraint on trade violates the rule of reason, the plaintiff must demonstrate that the restraint was reasonably calculated to prejudice the public interest. *Lamb Enterprises v. Toledo Blade Co.,* 461 F.2d 506, 517–18 (6th Cir.), *cert. denied,* 409 U.S. 1001, 93 S.Ct. 325, 34 L.Ed.2d 262 (1972). No such showing has been made in this case, nor can the Court infer one. Consequently, the rule of reason need not be further applied. *See Overseas Motors, Inc. v. Import Motors, Ltd.,* 375 F.Supp. 499, 541–42 (E.D.Mich. 1974), *aff'd,* 519 F.2d 119 (6th Cir. 1975).

---

**11.** Professor Bauer's conclusion is that courts should apply a per se rule to group boycotts "only when two conditions are met: first, the conduct must be intended to coerce or exclude other entrepreneurs; second, the conduct must be likely to have anti-competitive effects." Bauer, *supra,* at 705. Under Professor Bauer's test, which appears to be the same as the Ninth Circuit's test as enunciated in *Neeld v. National Hockey League,* 594 F.2d 1297 (9th Cir. 1978), the Court would reach the same conclusion, *i. e.,* that the per se rule should not be applied to this case.

However, even if the rule is applied, the alleged restraint was reasonable. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) requires a court, in evaluating a case under the rule of reason, to analyze the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed. 435 U.S. at 692, 98 S.Ct. at 1365. The purpose of the analysis is to form a judgment about the competitive significance of the alleged restraint. In this case, Fedders, a major national manufacturer of air conditioning equipment, purchased the assets of Chrysler's Airtemp Division, another manufacturer of air conditioning equipment. There is no suggestion that the purchase, in itself, violated any antitrust laws. During the course of negotiations, Chrysler and Fedders agreed that Chrysler would not rehire any of its former Airtemp management-level employees who refused job offers from Fedders. It should be noted that these employees were not in a formal contractual relationship with Chrysler, and the terms offered by Fedders were substantially similar to the terms of these employees' Chrysler employment. The reason for this "restraint" on the competition between Chrysler and Fedders for the services of former Airtemp employees is obvious; Fedders wished to retain the skilled services of management-level employees so that the change of ownership would result in minimal disruption of the ongoing business.[12] This purpose was not anti-competitive,[13] although it did have the anti-competitive effect of precluding two potential employers from competing for the services of a discrete group of employees. In essence, the agreement between Chrysler and Fedders can best be characterized as a covenant not to compete.[14]

It is well established that covenants not to compete do not violate the antitrust laws so long as they are reasonable. *See Darius Cole Transportation Co. v. White Star Line*, 186 F. 63 (6th Cir. 1911), *cert. denied*, 225 U.S. 704, 32 S.Ct. 837, 56 L.Ed. 1265 (1912); *United States v. Addyston Pipe & Steel*, 85 F. 271 (6th Cir. 1898), *mod'd*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); *Alders v. AFA Corp.*, 353 F.Supp. 654 (S.D.Fla.1973), *aff'd*, 490 F.2d 990 (5th Cir. 1974). "The question in every case [involving a covenant not to compete ancillary to the sale of a business] is whether the restraint is reasonably calculated to protect the legitimate interests of the purchaser in what he has purchased, or whether it goes so far beyond what is necessary as to provide a basis for the inference that its real purpose is the fostering of monopoly." *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 315 F.Supp. 45, 56 (S.D.N.Y. 1970), *aff'd*, 437 F.2d 566 (2d Cir. 1971). In the instant case, there are simply no grounds to support an inference that the agreement fostered a Fedders monopoly on the market for employee services or anything else. This conclusion further supports the Court's holding that the agreement between the defendants does not violate section 1 of the Sherman Act, although the Court's decision is independently based on the lack of public injury, as discussed above. Accordingly, judgment for the defendants will be entered on the Sherman Act claim.

### III. TORT CLAIMS UNDER STATE LAW

In Count II of their complaint, the plaintiffs allege that Fedders is liable in tort for its interference with the employment relationships between the plaintiffs and Chrysler. Plaintiffs also allege in Count II that

---

**12.** Deposition of Matthew Bolin 20–21; Deposition of William Blakeslee 12.

**13.** The purpose would have been anti-competitive had the agreement been entered into for the purpose of relieving Fedders of the necessity for "outbidding" Chrysler for the services of its former employees, for example. There are no facts to support a finding of any such anti-competitive purpose, however.

**14.** Although the agreement may best be characterized as a covenant not to compete, that does not preclude the agreement from also being treated as a group boycott. *See St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531, 544 n.16, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978).

Chrysler is liable in tort for "conspiring" with Fedders to interfere with the plaintiffs' employment rights, but that claim is without merit. If plaintiffs believe that Chrysler, their former employer, violated the conditions of their employment, their remedy must lie in contract.[15] *Cf. Koehler v. Cummings*, 380 F.Supp. 1294, 1313–14 (M.D.Tenn.1974) (dismissing civil conspiracy action by employer against former employee; proper action would be for breach of contract). As for the plaintiffs' tort claims against Fedders, the Court has concluded that the defendant's allegedly tortious conduct was privileged, and judgment will therefore be entered in favor of Fedders on Count II.

The plaintiffs' general claim is that Fedders wrongfully interfered with their employment relationships with Chrysler. This general claim encompasses two separate theories of recovery, however, as the plaintiffs have at least implicitly acknowledged in their brief. First, the plaintiffs claim that Fedders interfered with *existing* employment relations between them and Chrysler by procuring the initial dismissal of the Airtemp managerial employees after the sale of Airtemp's assets. Second, the plaintiffs allege that Fedders interfered with the plaintiffs' *prospective* employment opportunities in that the agreement between Chrysler and Fedders also prevented Chrysler from rehiring its former Airtemp managerial employees who refused employment with Fedders. These two theories, which are indeed separate tort claims, *see* W. Prosser, *The Law of Torts* §§ 129–130 (1971), will be discussed in order.

### A. Interference With Existing Contractual Relations

Although the plaintiffs were not parties to a formal written contract with Chrysler, their employment relations with Chrysler were nonetheless contractual. The underlying employment agreement was a contract terminable at will, and interference with such contracts may give rise to tort liability. *See* Prosser, *supra*, § 129, at 933. Contracts terminable at will receive a relatively low degree of protection, however.

Plaintiffs have correctly pointed out that this Court must apply Kentucky law in addressing the merits of their tort claim based on interference with existing contractual relations. A federal court sitting in a diversity case must apply the choice-of-law rules of the state in which it sits, *Hutto v. Benson*, 110 F.Supp. 355 (E.D. Tenn.1953), and in this case Tennessee law requires the Court to apply Kentucky law, because of the Tennessee rule that the law of the place where the tort occurred determines the rights of the parties. *Koehler v. Cummings*, 380 F.Supp. 1294, 1303 (M.D. Tenn.1974); *Winters v. Maxey*, 481 S.W.2d 755 (Tenn.1972).[16] Because the plaintiffs were employed in Bowling Green, Kentucky, and their dismissal occurred there, it is clear that if their dismissals were tortious, the tort occurred in Kentucky.

Kentucky courts have recognized at least since 1958, that a stranger to a contract may be held liable in tort for interfering with a contractual relation between the plaintiff and a third party. *See Derby Road Building Co. v. Commonwealth*, 317 S.W.2d 891, 894 (Ky.1958). In the most recent statement from a Kentucky court, the Court of Appeals concluded that tort liability exists for malicious interference with known contractual rights, at least when accomplished by unlawful means such as fraud, deceit, or coercion. *Henkin, Inc. v. Berea Bank & Trust Co.*, 566 S.W.2d 420, 425 (Ky.App.1978). The language in *Henkin* is somewhat at odds with the language in *Carmichael-Lynch-Nolan Advertising Agency v. Bennett & Associates*, 561 S.W.2d

---

**15.** This claim's lack of merit is further demonstrated by the plaintiffs' failure to address it in their trial brief. Moreover, there is no reference to a civil conspiracy theory in the pretrial order, and therefore the Court concludes that the issue of Chrysler's liability under Count II was not before the Court at trial. *See* F.R. Civ.P. 16.

**16.** The defendants failed to consider the choice-of-law issues in their brief, apparently assuming that Tennessee law was to be applied.

99, 102 (Ky.App.1977), in which the Court of Appeals adopted the guidelines of the Restatement of Torts:

> Except as stated in Section 698, one who, without a privilege to do so, induces or otherwise causes a third person not to
>
> (a) perform a contract with another or
>
> (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby.

Restatement of Torts § 766 (1939) [hereinafter cited as First Restatement]. Apparently the *Henkin* court's view of tortious conduct is somewhat narrower than that of the *Carmichael* court, but for the purposes of this case, there is no need to plumb the depths of the possible inconsistency.

 In light of the available Kentucky law,[17] coupled with an analysis of the facts of this case, the Court holds that Fedders was privileged to procure an agreement with Chrysler that Chrysler would dismiss its Airtemp Division employees upon the sale of Airtemp's assets. The Court recognizes a legitimate interest in the freedom of a corporation that purchases the assets of another corporation or its subsidiary to require the dismissal of the selling corporation's managerial employees as one of the conditions of the sales agreement. The plaintiffs' position would logically lead to the conclusion that all employees who lose their jobs when their employer sells out to another company have a cause of action in tort against the buyer. Such an expanded view of tort liability is unprecedented, and this Court perceives no reason why it should not remain so.

The tort of interference with contractual relations has not "fully developed," Restatement (Second) of Torts § 767, Comment k (1979) [hereinafter cited as Second Restatement], and in the absence of crystallized rules or privileges, courts must engage in a balancing process to determine whether a defendant's conduct was tortious. Second Restatement § 767, Comment j. In the instant case, the Court should weigh the interest of Fedders against the interests of the former Airtemp managers. *See* Second Restatement § 767(c) and (d). Fedders' interest is its freedom to negotiate a sale of assets contract with Chrysler according to the terms agreed upon by both, including provisions that require the termination of Chrysler's employees. The Chrysler employees have an interest in their existing employment by Chrysler, which may be characterized as a contractual interest terminable at will.

The employees have no legal right to continued employment by Chrysler, but only an expectation of such employment. *See* Second Restatement § 768, Comment i. Moreover, the plaintiffs' expectation of continued Chrysler employment is particularly questionable, given the precarious financial condition of that company, which this Court may judicially notice. Fed.R.Evid. 201. In short, the plaintiffs' interest carries relatively little weight, and should therefore receive a relatively low degree of legal protection.

Fedders, on the other hand, had a legal right to negotiate the sale of Airtemp's assets with Chrysler. As a result of that negotiation process, Fedders interfered with the plaintiffs' expectation of continued Chrysler employment by demanding the termination of Airtemp managers, a demand to which Chrysler agreed. As a matter of policy, it seems desirable for prospective buyers like Fedders to have the freedom to negotiate such terms without fear of tort liability, because the absence of such freedom might prevent economically desirable business transactions. Although there are exceptions, in today's economy a business that wants to sell its assets is probably in financial peril. Consequently, the sale of such a company's assets may be the only

---

17. *See also Industrial Equipment Co. v. Emerson Electric Co.*, 554 F.2d 276 (6th Cir. 1977); *Davis H. Elliot Co. v. Caribbean Utilities Co.*, 513 F.2d 1176 (6th Cir. 1975); *Thermo Thrift Industries, Inc. v. Mono-Therm Insulation Systems*, 450 F.Supp. 398 (W.D.Ky.1978); *Walt Peabody Advertising Service v. Pecora*, 393 F.Supp. 328 (W.D.Ky.1975). All of these cases were decided prior to *Carmichael* and *Henkin*, and therefore the Court has not relied upon them to any significant extent.

way of preserving its role in the economy, *though under a different identity.* Plaintiffs' position would deter such relatively beneficial transactions, since a potential buyer might fear tort liability if the transaction results in the termination of the seller's employees. In many cases, such terminations may be entirely justified, especially if the performance by the old employees is a reason for the decline of the selling company. On the other hand, such terminations by the selling company may be motivated by the buyer's desire to hire the experienced employees itself. Such is the situation in this case. Fedders required the termination of the plaintiffs because it wanted the opportunity to retain their skilled services, an opportunity Fedders legitimately believed to be in its business interest. There was certainly no motive on the part of Fedders to injure the plaintiffs. The absence of any improper motive is an important consideration in this case, *see* Second Restatement § 767(a), and it weighs heavily in Fedders' favor.

Therefore, this Court finds that, in the absence of an injurious motive, Fedders' interest in buying Airtemp's assets and securing the services of former Airtemp managers outweighs the managers' interest in their existing employment by Chrysler. Consequently, Fedders was privileged to induce the termination of these plaintiffs, even though it did interfere with their expectation of continued Chrysler employment. Judgment will accordingly be entered for the defendant Fedders on that part of Count II alleging interference with *existing* contractual relations.

### B. *Interference With Prospective Economic Advantage*

The plaintiffs' second theory of recovery for Fedders' interference with their employment relations is based on the fact that, in addition to forcing the initial termination of all Airtemp managerial employees, Fedders also procured an agreement with

Chrysler that Chrysler would not rehire any of its former Airtemp employees who refused employment with Fedders. Although the plaintiffs did not use the term in their brief, the Court will characterize this alleged tort as interference with prospective economic advantage, *see* Prosser, *supra*, § 130, or interference with a prospective contractual relation. *See* Second Restatement § 766B. The plaintiffs maintain, in essence, that Fedders harmed them by inducing Chrysler not to rehire them in any division of Chrysler anywhere in the country for an unlimited period of time, to the detriment of their prospective employment opportunities.

Although the Court finds that the plaintiffs have established that they suffered an injury to their prospective contractual relations because of this agreement,[18] Fedders is not liable to them, because the interference was not improper. *See* Second Restatement § 767. Before discussing the merits of the plaintiffs' tort claim, however, the Court must address a troublesome conflict of laws issue.

#### 1. Choice-of-Law

As was discussed above, this Court must apply Tennessee choice-of-law rules in determining which state's substantive law applies in this action. Tennessee law requires a court sitting in a tort case to apply the law of the place where the tort occurred. *Winters v. Maxey,* 481 S.W.2d 755 (Tenn.1972). *See also Great American Insurance Co. v. Hartford Accident & Indemnity Co.,* 519 S.W.2d 579 (Tenn.1975). The Court is therefore faced with the problem of determining where the alleged interference with prospective economic advantage occurred in this case. In the instant case, it is clear that the alleged interference with *existing* employment relationships occurred in Kentucky, because the plaintiffs were employed in Chrysler's Bowling Green plant. The question of where the plaintiffs have suffered injury to their *prospective*

---

18. For the purposes of establishing their prima facie case, the plaintiffs need not show that Chrysler would in fact have rehired them. The Court is satisfied that Chrysler was precluded from hiring them, and that showing is sufficient for a prima facie case of prospective interference.

employment relations is not so simple, unfortunately.

The gravamen of this tort is interference, and thus the inquiry in determining the locus delicti should focus on the question of where the interference occurred. The problem with this otherwise sensible approach is that it does not make much sense in the instant case, because the plaintiffs were at least potentially interfered with in every state in which Chrysler hires managerial employees, in that the agreement prevented Chrysler from rehiring its former Airtemp employees anywhere. For obvious reasons, the Court cannot apply the law of all these states. Moreover, for the purposes of the plaintiffs' prospective interference claim, the fact of their previous employment in Kentucky is of little significance. After the sale of the Bowling Green operation to Fedders and the plaintiffs' ensuing termination, Kentucky is simply one more state in which the plaintiffs have no opportunity to work for Chrysler, assuming that there are existing Chrysler operations in Kentucky. The Court cannot conclude that because the plaintiffs were *previously* employed in Kentucky, the tort of *prospective* interference lies there.

The Court has further concluded that the location of the sales agreement between Chrysler and Fedders is only a minor consideration in determining where this alleged tort occurred. Agreement is not the gravaman of this tort; the gist of the tort is interference, and the agreement that led to the interference is not the interference. Perhaps this point is easier to demonstrate in the context of interference with existing contractual relations. For example, in the instant case, it cannot reasonably be argued that an interference with the employees' existing contractual relations occurred in New York if the agreement had been made in New York; the interference occurred in Kentucky, the place of their existing employment. The place of the agreement is likewise irrelevant for the purposes of determining where the prospective interference occurred.

 Having rejected the propositions that the tort occurred: (a) where the agreement was made; (b) where the plaintiffs were previously employed; or (c) in any and all states where Chrysler hires management employees, the Court is persuaded that the tort occurred in the state of each plaintiff's residence. This conclusion requires the Court to apply the law of Tennessee in the case of Mr. Cesnik, and Kentucky law in the case of Mr. Griffith.[19] The Court has reached this conclusion by focusing on the question of where the plaintiffs suffered the interference with their prospective employment relations. Although in one sense the plaintiffs have been interfered with in every state where Chrysler operates and might have hired them, as a realistic matter the plaintiffs have experienced the constriction of their employment opportunities primarily in the states where they reside. For example, it may be that Mr. Cesnik is unable to obtain a Chrysler job in Missouri because of the Chrysler-Fedders' agreement. Mr. Cesnik does not experience that constriction of his opportunities in Missouri, however; he experiences it in Tennessee, *the state of his residence*.[20] The Court recognizes the general rule that "[w]here there is a multi-state tort, the place of the wrong is 'the state where the last event necessary to make an actor liable for an alleged tort takes place.'" *Koehler v. Cummings*, 380 F.Supp. 1294, 1305 (M.D. Tenn.1974), *quoting* Restatement of Conflict of Laws § 377 (1934). The Court believes that its analysis is in keeping with that principle, however, because the "last event necessary" in this tort is the constric-

---

**19.** These were the respective states of residence of the plaintiffs at the time of filing.

**20.** For the purposes of convenience and uniformity, the place of a plaintiff's residence should be determined as of the time of the filing of the complaint. This is not inconsistent with the Court's analysis, because a plaintiff's residence at the time of filing is presumably the place where he first experiences his injury. The Court does not fear the possibility of forum shopping by using this approach, because this is simply not the sort of tort claim that lends itself to forum shopping.

tion of the plaintiff's opportunities, and that occurs where the plaintiff experiences it, i. e., his place of residence.

## 2. Application of Kentucky Law to the Claim of Plaintiff Griffith

 So far as the Court can determine, there are no Kentucky cases on interference with *prospective* contractual relations. To the extent that there is any Kentucky law on point, it must be found in those cases dealing with interferences with existing economic relations. Once again, the *Carmichael* case, 561 S.W.2d 99 (1977), provides significant guidance to this Court, in that it adopts the language of the First Restatement § 766. That section states that a person is liable in tort if, without a privilege to do so, he induces a third person not to enter into a business relation with another.[21] As a general rule, however, permissible interferences with *prospective* contractual relations are given a broader scope than permissible interferences with *existing* contractual relations. Second Restatement § 767, Comments e, j (1979). In other words, a plaintiff's interest in his prospective advantage receives a relatively low degree of protection. *See* Prosser, *supra*, § 130, at 954.[22]

 In this case, the plaintiffs have proven that Fedders induced Chrysler not to rehire any of its former Airtemp managerial employees, conduct that may reasonably be characterized as a form of interference. Fedders' interference was privileged however, primarily because Fedders was acting to promote its economic interest when Fedders induced Chrysler not to rehire its former Airtemp employees. According to the Second Restatement, when the defendant's interest is economic, it will normally prevail over the plaintiff's economic interest, so long as the defendant does not use "wrongful means" in interfering with the plaintiff's interest. Second Restatement § 767, Comment f. Section 768, Comment e of the Second Restatement sets forth certain examples of "wrongful means of interference," including physical violence, fraud, civil suits, and criminal prosecutions. Comment e goes on to state that refusals to deal do not usually constitute such wrongful means.[23] Finally, the Kentucky Court of Appeals has indicated that a plaintiff may recover only when the defendant interferes with him by such means as fraud, deceit, or coercion. *Henkin v. Berea Bank & Trust Co.*, 566 S.W.2d at 425. Thus, this Court is satisfied that agreements such as the one between Chrysler and Fedders are not an unlawful means of interfering with a plaintiff's prospective employment opportunities when the defendant is acting to promote his own economic interest.

The defendants' lack of a purpose to harm the plaintiffs is also very important to the Court's finding that Fedders was privileged to promote its economic interest by means of the agreement. *See* Second Restatement § 767(b). Indeed, Prosser states that the cases in this area have often turned on the defendant's motive or purpose. Prosser, *supra*, § 130, at 953.

21. Cf. *Henkin v. Berea Bank & Trust Co.*, 566 S.W.2d at 425, in which the Court of Appeals appears to have narrowed the scope of the tort.

22. It may be observed that the Court's reasoning in regard to the plaintiffs' claim of prospective interference is virtually identical to that used in dealing with the first theory of recovery, i. e., that the defendants interfered with existing relationships. The existing relationships in this case were contracts terminable at will, the interest in which is primarily an interest in future relations, and thus closely analogous to the interest in prospective contractual relations. *See* Second Restatement § 766, Comment g. The Court has considered the claims independently, however, because of their essentially different bases. The first theory is based on the fact that the plaintiffs were terminated from Chrysler; the second claim is based on the additional, independent agreement that Chrysler would not rehire the plaintiffs in the future. Because the claims derive from analytically distinct sources, the Court has dealt with them discretely, although the considerations are much the same.

23. The Court recognizes that section 768 deals with the privilege of competition, a privilege that is clearly not applicable in the instant case. However, Comment e's explication of what the Restatement refers to as "wrongful means" of interference is still persuasive.

Therefore, because Fedders was acting to further its economic interest when it interfered with the plaintiffs' prospective employment opportunities, and in the absence of any purpose on the part of Fedders to harm Mr. Griffith, the Court finds that Fedders was privileged to induce Chrysler not to rehire him. To express it another way, although the plaintiff has demonstrated an interest in prospective employment with Chrysler, albeit a rather remote and insubstantial interest, that interest does not so far outweigh Fedders' interest in securing skilled managerial employees that the law should protect these employees. Therefore, this Court will enter judgment in favor of Fedders against the plaintiff Griffith.

### 3. Application of Tennessee Law to the Claim of Plaintiff Cesnik

■ The Court has determined that Tennessee substantive law applies to Mr. Cesnik's claim that Fedders interfered with his prospective employment relations. This determination is of little practical importance, however, because like Kentucky, Tennessee has not developed any significant body of law on this particular tort.[24] Therefore, this Court will apply the same reasoning applied to Mr. Griffith's claim under Kentucky law.

As in the case of Mr. Griffith, Fedders was privileged to interfere with Mr. Cesnik's prospective opportunity to be employed by Chrysler. There are three factors that lead to this conclusion: (1) Mr. Cesnik's lack of legal entitlement to possible future employment by Chrysler, an interest whose conjectural nature lowers is corresponding legal protection; (2) Fedders' business motivation for its agreement with Chrysler, the purpose of which was to help Fedders obtain the services of skilled managerial em-

ployees; and (3) the lack of any purpose on the part of Fedders to harm the plaintiffs. Based on these considerations, which are discussed at length above, the Court will enter judgment for Fedders on this claim.

## IV. CONCLUSION

To summarize, the Court will enter judgment for the defendants on Count I of the complaint, which alleges a violation of section 1 of the Sherman Act. Judgment will also be entered for the defendants on Count II, which the Court has treated as encompassing two separate theories of tort liability.

---

**24.** Unlike, Kentucky, Tennessee does have a substantial case law on interference with existing contractual relations. *See Edwards v. Travelers Insurance*, 563 F.2d 105, 119–122 (6th Cir. 1977); *Koehler v. Cummings*, 380 F.Supp. 1294, 1305–06 (M.D.Tenn.1974); *Dynamic Motel Management, Inc. v. Erwin*, 528 S.W.2d 819 (Tenn.App.1975); *Mefford v. City of Duponto-* *nia*, 49 Tenn.App. 349, 354 S.W.2d 823 (1961). In fact, Tennessee has a statute that codifies the common law tort and provides for treble damages. T.C.A. § 47–15–113 (1979). These authorities do not provide any significant guidance in dealing with interferences to prospective advantage, however.