

Villanova University School of Law Digital Repository

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-2-2007

# Eichorn v. AT&T Corp

Precedential or Non-Precedential: Precedential

Docket No. 05-5461

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Eichorn v. AT&T Corp" (2007). *2007 Decisions.* Paper 1047.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1047

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Case No:  05-5461
_____

KURT H. EICHORN; WILLIAM J. HUCKINS;
T. ROGER KIANG; EDWARD W. LANDIS;
ORLANDO NAPOLITANO, INDIVIDUALLY AND
ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED; GILBERT G. DALEY;
SUSAN H. DIBONA; BETH KING;
MICHAEL S. ORATOWSKI;
THOMAS L. SALISBURY; LAWRENCE WALSH,
individually and on behalf of all others similarly
situated; WILLIAM LAWLESS;
RUSSELL LEPPALA; GABE P. TOROK;
JUDITH B. BRUGNER; KATE HARRIS;
CAROLE T. JOHNSON; CHARLES O. LAUGHLIN, II;
MICHAEL A. MCFARLAND; BARBARA OLIVER;
GARY PATTERSON; ROBERT PROUIX; WILLIAM J.
SCHROTT; ROBERT MICHAEL SHEPHERD; RONALS
A. SOKOL; JOSEPH T. SZLASA; DIANE F. TAYLOR;
LORRAINE J. WELCH; MARIE ZEITS,

Appellants

v.

AT&T CORP.; LUCENT TECHNOLOGIES INC.; TEXAS
PACIFIC GROUP; NCR CORPORATION; THE CIT
GROUP, INC.; JOHN DOE CORPORATIONS 1-10

_____

On Appeal From the United States District Court
for the District of New Jersey
(D.C. Civil Nos. 96-cv-04674; 96-cv-03587)
District Judge: Honorable Stanley R. Chesler

_____

Submitted Under Third Circuit LAR 34.1(a)
March 27, 2007

Before:   FISHER, JORDAN and ROTH, *Circuit Judges*

(Filed May 2, 2007)

_____

Noel C. Crowley
Crowley & Crowley
20 Park Place - Suite 206
Morristown, NJ 07960
    *Counsel for Appellant*s

2

Carmine A. Iannaccone
James P. Flynn
Lauren D. Daloisio
Epstein, Becker & Green
Two Gateway Center - 12th Fl.
Newark, NJ   07102
    *Counsel for Appellees AT&T Corp.,*
    *Lucent Technologies, Inc. and NCR Corp.*

David M. Fabian
Christine M. Gurry
Traflet & Fabian
264 South Street
Carriage Court Two
Morristown, NJ 07960
    *Counsel for Appellee, TX PAC Group*

Robert M. Leonard
Drinker, Biddle & Reath
500 Campus Drive
Florham Park, NJ   07932
    *Counsel for Appellee, CIT Group, Inc.*

_____

OPINION OF THE COURT
_____

3

JORDAN, *Circuit Judge*.

This case is before us for the second time on appeal. In the previous appeal, *Eichorn v. AT&T Corp.*, 248 F.3d 131 (3d Cir.), *cert. denied*, 534 U.S. 1014 (2001), we held that the plaintiffs had presented sufficient evidence of the defendants' specific intent to interfere with their pension rights to survive summary judgment on their claims under § 510 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1140. *Id.* at 150. We reversed the District Court's order granting summary judgment to the defendants and remanded for further proceedings. *Id.* After nearly three years of additional proceedings on remand, the District Court again granted summary judgment to the defendants, holding that the relief the plaintiffs sought was not available to them. The plaintiffs appeal from that order and challenge several of the District Court's interlocutory orders. We will affirm.

I

We have previously set forth the basic facts in this litigation, *Eichorn*, 248 F.3d at 136-37, and we recite only the facts relevant to the present decision.

A

The plaintiffs are former employees of Paradyne Corporation ("Paradyne"). In 1995, Paradyne was part of AT&T Corp. ("AT&T"). AT&T reorganized that year, splitting into three parts: AT&T, Lucent Technologies, Inc. ("Lucent"), and NCR Corporation. In the course of the

reorganization, AT&T transferred Paradyne to Lucent. In 1996, Lucent sold Paradyne to a business called Texas Pacific Group ("Texas Pacific"). Before that sale, the plaintiffs in this case had pension plans that included certain "bridging rights." If an employee left Lucent or another of the former AT&T companies and returned within six months, either to the company the employee had left or to another of the former AT&T companies, the employee could "bridge" the two terms of employment, receive pension credit for all prior service, and continue to accrue pension benefits as if he had never left. If the employee left and did not return until after the six-month "bridging period" had expired, the employee would need to work for an additional five years to regain his previous level of pension benefits.

The alleged basis for the plaintiffs' ERISA claims is that the defendants entered into agreements as part of the sale of Paradyne that had the effect of cancelling the plaintiffs' bridging rights. In 1995, when Paradyne was part of AT&T, AT&T announced its intent to sell Paradyne. Recognizing the value of Paradyne's work force, and wanting to make Paradyne more attractive to potential buyers, AT&T announced a policy precluding any employee who voluntarily left Paradyne from being hired by any other division of AT&T. On June 18, 1996, Lucent and Texas Pacific signed a purchase agreement for the sale of Paradyne, and on July 31, 1996, the sale closed. The June 18 purchase agreement included a provision—referred to in this litigation as the "Pre Closing Net"—whereby Lucent promised that neither it nor any of the other former AT&T companies would hire any Paradyne employees who left Paradyne voluntarily before the

sale closed and whose annual salaries were more than $50,000.  On the date of the closing, Lucent signed an "employee matters agreement," which included a paragraph—referred to in this litigation as the "Post Closing Net"—extending the provisions of the Pre Closing Net for 245 days (eight months) after the closing.

Once the sale closed, the Paradyne employees' employment with Lucent terminated, and the "bridging period" began.  Because the no-hire agreement embodied in the Pre Closing Net and Post Closing Net lasted for eight months, the Paradyne employees who made more than $50,000 annually were prevented from exercising their bridging rights.[1]

## B

Near the time of the Paradyne sale, Kurt Eichorn and Gilbert Daley filed substantially identical class action complaints in the United States District Court for the District of New Jersey, naming AT&T, Lucent, and Texas Pacific as defendants, and asserting, inter alia, that the Pre Closing Net and Post Closing Net violated § 510 of ERISA.  The actions were consolidated and, after discovery, the District Court granted the defendants' motion for summary judgment,

---

[1]Of the 29 plaintiffs in this case, 3 eventually returned to Lucent, and all 3 remained there long enough to bridge their pension rights, though they note they were "damaged by loss of pension-created service during the time corresponding to their period of separation."

6

holding that the plaintiffs had not put forth sufficient evidence to create a triable issue of fact as to whether the defendants had the required intent to interfere with the plaintiffs' bridging rights. *Eichorn v. AT&T Corp.*, No. 96-3587, 1999 WL 33471890, at *2-6 (D.N.J. Aug. 23, 1999). On appeal, this court reversed and remanded that holding because we determined that the plaintiffs had presented sufficient circumstantial evidence to create a genuine issue of material fact regarding the defendants' intent. *Eichorn*, 248 F.3d at 149-50. The panel also directed the District Court on remand to address the plaintiffs' motions for additional discovery and for class certification. *Id.* at 150.

## C

On remand, the District Court reopened discovery and allowed the plaintiffs to file a motion for class certification. The parties appear to have proceeded after remand on the assumption that the plaintiffs would be entitled to some form of compensatory damages if they succeeded in proving their ERISA claims. On May 27, 2003, over three months after the close of reopened discovery and some seven years from the start of the case, the plaintiffs submitted spreadsheets to the District Court, offering their damage calculations for the first time. The spreadsheets were prepared by plaintiffs' counsel's son, Stephen Crowley, who was not offered as an expert and has no training or experience with the economics of employment benefits.

Mr. Crowley's calculations purported to quantify what each plaintiff would have earned in pension benefits, had he

7

or she remained employed at an AT&T company after the sale of Paradyne. In performing the calculations, Mr. Crowley made various assumptions about such future events as when the plaintiffs would have retired, how their salaries would have increased had Paradyne remained part of Lucent, what choices the plaintiffs would have made with respect to their pension benefits, and what each plaintiff's life expectancy was. With his calculations, Mr. Crowley submitted a life expectancy chart from the "Foundation for Infinite Survival" and various statistical tables from the United States Department of Labor which, he asserted, provided part of the basis for his calculations.

The District Court accepted the plaintiffs' belated submissions and reopened discovery again to allow the defendants to depose Mr. Crowley. After deposing Mr. Crowley, the defendants made a motion to strike his calculations and to preclude him from testifying at trial. The plaintiffs opposed the motion and argued that, if the District Court were to grant the defendants' motion, the plaintiffs should be allowed to engage a damages expert. On November 10, 2004, the District Court granted the defendants' motion and denied as untimely the plaintiffs' request for leave to engage an expert.

In the course of making his initial ruling from the bench, which was later reduced to a written order, the District Judge explained that he did not believe his order would effectively end the case for the plaintiffs, because the plaintiffs might still be entitled to seek back pay and would

not need the assistance of an expert to establish their entitlement to that relief. The Judge said,

> at a minimum, it would appear that a back pay case can in some manner or other go to the jury. Indeed, in this type of ERISA claim, a back pay claim is normally one of the court claims which go. In short, the theory of the case is that the plaintiffs were precluded from employment because of and based upon a desire to deny them ... rights which they have under ERISA ... .
>
> And therefore, in the Court's view, what could and would go to the jury would indeed be claims predicated upon the denial of their employment and potential back pay claims.

Further, the District Judge noted that the plaintiffs sought injunctive relief, and the Judge agreed that there was "at least a possibility" that such relief was available. Even so, he did not definitively rule on the issue, and the written order stated that "the Court does not reach the issue whether plaintiffs can quantify or establish any right to 'back pay' and/or equitable relief increasing plaintiff[s'] pension benefits and reserves such issue for resolution at or before trial." After he granted the defendants' motion to strike Mr. Crowley's testimony and evidence, the District Court ordered the parties to confer with a magistrate judge "to schedule limited discovery of remaining damages issues and preparation of a final pretrial order."

After the reopened discovery closed, the defendants moved for summary judgment. They argued that the only relief available to the plaintiffs on their claim under ERISA § 510 for unlawful interference with benefits is the "appropriate equitable relief" available through § 502(a)(3) of the statute. Summary judgment was appropriate, they argued, because the only relief that the plaintiffs had requested or could request—given the District Court's order striking Stephen Crowley's submissions and denying the plaintiffs leave to find an expert to replace him—was "back pay," which is not "equitable relief" under § 502(a)(3). The District Court agreed with that analysis and, accordingly, granted summary judgment to the defendants. The plaintiffs now appeal, challenging the summary judgment order, the order that struck Stephen Crowley's submissions and denied leave to retain an expert, and certain other interlocutory orders.[2]

---

[2]The plaintiffs challenge the District Court's order of October 23, 2003, denying the plaintiffs' motion for class certification, and its orders of April 16, 2003, and July 19, 2005, denying the plaintiffs' motions to compel discovery of certain matters. We have considered the arguments of the parties with respect to the District Court's order of April 16, 2003. We are satisfied that the District Court correctly interpreted the mandate of this court with respect to the scope of the § 510 claims as to which the plaintiffs had presented enough evidence to survive a motion for summary judgment, and that the District Court did not otherwise abuse its discretion in denying the plaintiffs' motion to compel. The plaintiffs' challenges to the District Court's orders of October 23, 2003, and July 19, 2005, are moot in light of our

II

The plaintiffs argue that the District Court erred both in ruling that Mr. Crowley's proposed evidence was inadmissible and in denying them leave to present an expert in lieu of Mr. Crowley. More specifically, though the plaintiffs concede that Mr. Crowley was not qualified as an expert, they argue that no special qualifications were necessary to testify regarding future damages in this case and that Mr. Crowley's testimony and spreadsheets were admissible under Federal Rule of Evidence 1006 as summaries of the contents of the statistical tables he submitted. The plaintiffs also argue that the District Court's order denying them leave to retain an expert witness after Mr. Crowley was excluded was an abuse of discretion. Those arguments are without merit.

A

In excluding Mr. Crowley's evidence, the District Court was within the broad discretion afforded it under Federal Rules of Evidence 701 and 702 to act as a gatekeeper charged with preventing unreliable opinion testimony. Although this court has recognized that lay opinion as to technical matters may sometimes be appropriate, *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1200-01 (3d Cir. 1995), we have cautioned that "Rule 701 requires that a lay opinion witness have a reasonable basis grounded either in *experience or specialized knowledge* for arriving at the opinion that he or she expresses. ... In order to satisfy these

disposition of this case.

11

Rule 701 requirements, the trial judge should rigorously examine the reliability of the lay opinion by ensuring that the witness possesses sufficient special knowledge or experience which is germane to the lay opinion offered." *Id.* at 1201 (original emphasis). Whether a witness is "qualified" to offer opinion testimony is committed to the discretion of the trial court, and we have no difficulty holding that the District Court was within its discretion in saying that Mr. Crowley was not qualified to offer a damages opinion here. As the plaintiffs concede, Mr. Crowley had no personal knowledge of the underlying facts and no relevant experience or training.[3]

We also reject the plaintiffs' argument that Mr. Crowley's submissions were admissible under Rule 1006. That Rule provides that "[t]he contents of voluminous

---

[3]The plaintiffs correctly note that expert testimony is not always required to prove damages in cases where projected future earnings are part of the calculation. *See, e.g.*, *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175-76 (3d Cir. 1993); *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 797 (3d Cir. 1985). Here, however, the calculations were sufficiently complex that the District Court was within its discretion to hold that someone more qualified than plaintiffs' counsel's son was needed to testify. *Cf. Lifewise Master Funding v. Telebank*, 374 F.3d 917, 928-29 (10th Cir. 2004) ("Given Mr. Livingston's utter lack of any familiarity, knowledge, or experience with damages analysis, the district court did not abuse its discretion in ruling that he could not testify as an expert regarding such a complex subject matter as LifeWise's fourth damages model.").

12

writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Courts have cautioned that Rule 1006 is "not a back-door vehicle for the introduction of evidence which is otherwise inadmissible," and that the voluminous evidence that is the subject of the summary must be independently admissible. *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (11th Cir. 2004); *see also United States v. Pelullo*, 964 F.2d 193, 204-05 (3d Cir. 1992). The plaintiffs' proffered calculations are better described as a synthesis rather than a summary of the charts and other evidence on which Mr. Crowley relied. The calculations went beyond the data they summarized and included several assumptions, inferences, and projections about future events, which represent Mr. Crowley's opinion, rather than the underlying information. The proposed evidence is thus subject to the rules governing opinion testimony and was properly held inadmissible. *See* Fed. R. Evid. 701, 702; *Gomez v. Great Lakes Steel Div. Nat'l Steel Corp.*, 803 F.2d 250, 258 (6th Cir. 1986) (proposed exhibit was improperly admitted because, despite being labeled "Summary of Actual Damages," it "projected future events and economic losses, and was therefore not a simple compilation of voluminous records."); *State Office Sys., Inc. v. Olivetti Corp.*, 762 F.2d 843, 845-46 (10th Cir. 1985) (projections of future lost profits set forth in a summary "are not legitimately admissible as summaries under Rule 1006, since they are interpretations of past data and projections of future events, not a simple compilation of voluminous records.").

B

In denying the plaintiffs leave to engage an expert to replace Mr. Crowley, the District Court was within its power under Rule 16(b) of the Federal Rules of Civil Procedure to make and enforce scheduling orders. Rule 16 gives the district courts wide latitude to manage discovery and other pretrial matters, and to set deadlines for amending pleadings, filing motions, and completing discovery. Subsection (b) provides that scheduling orders "shall not be modified except upon a showing of good cause and by leave of the district judge." This Court and others have frequently upheld a trial court's exercise of discretion to deny a party's motion to add experts or other fact witnesses after the close of discovery or after a deadline in a scheduling order. *E.g., Burks v. Okla. Publ'g Co.*, 81 F.3d 975, 978-80 (10th Cir. 1996); *Geiserman v. MacDonald*, 893 F.2d 787, 790-91 (5th Cir. 1990); *Koplove v. Ford Motor Co.*, 795 F.2d 15, 18 (3d Cir. 1986).

In this case, the reopened discovery on remand closed in January of 2003. As the defendants note, the plaintiffs were obligated under Federal Rule of Civil Procedure 26(a)(1)(C) to disclose early in the case, at or within 14 days after the discovery planning conference required by Rule 26(f), "a computation of any category of damages claimed" and "the documents or other evidentiary material, not privileged or protected from disclosure, on which such [damage] computation is based ... ." The plaintiffs did not submit that information until May 2003, several months after the reopened discovery had closed, and nearly seven years into this litigation. Although the District Court pressed

plaintiffs' counsel about plaintiffs' plan to proceed without expert testimony on the issue of damages, and although the Court told plaintiffs' counsel that "defendants have to know what claims a plaintiff is going to pursue in terms of damages in order to be able to prepare for it," the plaintiffs insisted that no expert testimony was necessary. The District Court then reopened discovery again to allow the defendants to depose Mr. Crowley. The plaintiffs did not request leave to present a damages expert until after the defendants filed their motion to exclude Mr. Crowley. The District Court considered the plaintiffs' explanation for the lateness of their request, the prejudice that would result if it were granted or denied, and the extent to which the plaintiffs' decision to proceed without expert testimony was a deliberate one. Under the circumstances, the District Court was well within its discretion to deny the plaintiffs' motion.

III

Section 510 of ERISA, 29 U.S.C. § 1140, makes it unlawful for an employer to act against an employee "for the purpose of interfering with the attainment of any right to which such participant might become entitled" under a benefit plan. Section 510 concludes with the statement that "[t]he provisions of section 1132 [i.e., ERISA § 502] of this title shall be applicable in the enforcement of this section." The Supreme Court has held that the remedies available for a violation of § 510 are thus limited to those set forth in § 502(a) of ERISA, 29 U.S.C. § 1132. *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 144 (1990); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987); *Mass. Mut. Life Ins. Co. v.*

15

*Russell*, 473 U.S. 134, 146 (1985); *see also Cox v. Keystone Carbon Co.*, 861 F.2d 390, 392 (3d Cir. 1988) (explicitly rejecting the argument that "once Congress created a right pursuant to § 510, Congress was without power to restrict the remedies available ... [and] it is entirely up to the court to fashion appropriate remedies... .").

Though the parties dispute the scope and application of subsections (a)(1)(B) and (a)(3), they do not suggest that any other portions of ERISA § 502 apply to this case.

A

The District Court held that the plaintiffs could not seek relief under ERISA § 502(a)(1)(B) because that section only provides relief for violations of the terms of a benefit plan, and the plaintiffs have not alleged such a violation. We agree.

1

Subsection (a)(1)(B) provides that "[a] civil action may be brought by a participant or beneficiary ... to recover benefits due to him *under the terms of his plan*, to enforce his rights *under the terms of the plan*, or to clarify his rights to future benefits *under the terms of the plan*." 29 U.S.C. § 1132(a)(1)(B) (emphasis added). The subsection thus provides a cause of action only where a plaintiff alleges a violation of the terms of a benefits plan or an ambiguity in the plan requiring judicial interpretation. In holding that subsection (a)(1)(B) is not an appropriate vehicle for

16

enforcing a claim of interference with the benefits of a plan, which is the gravamen of the claim here, the Seventh Circuit explained:

> [T]o enforce the terms of a plan under Section 502, the participant must first qualify for the benefits provided in that plan. Rather than concerning itself with these qualifications, one of the actions which Section 510 makes unlawful is the interference with a participant's ability to meet these qualifications in the first instance.

*Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1134 (7th Cir. 1992) (citation omitted). This appears to be the view of the few courts that have squarely confronted the issue. *See Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 142 (2d Cir. 1999) (citing *Tolle*); *Russell v. Northrop Grumman Corp.*, 921 F. Supp. 143, 150 (E.D.N.Y. 1996) (citing *Tolle*). Other courts have implicitly taken this view by indicating in dicta that § 502(a)(3) is the provision available for enforcing a § 510 interference claim. *See Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1247 (10th Cir. 2004) ("Section 502(a)(3) of ERISA provides the plan participant with his exclusive remedies for a § 510 violation."); *Spinelli v. Gaughan*, 12 F.3d 853, 856 (9th Cir. 1993) (quoting § 502(a)(3) as the enforcement mechanism for rights under § 510); *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 421 (4th Cir. 1993) (Section 510, "enforced through § 1132(a)(3) [i.e., § 502(a)(3)], provides a companion to § 1132(a)(1), which provides actions to recover benefits or clarify rights."); *Held*

17

*v. Mfrs. Hanover Leasing Corp.*, 912 F.2d 1197, 1203 (10th Cir. 1990) ("If discharging [the plaintiff] was 'unlawful' under § 1140 [i.e., § 510], plaintiff was entitled to bring (and did bring) an action for declaratory and injunctive relief under 29 U.S.C. § 1132, which authorizes [the relief set forth in ERISA § 502(a)(3)].");[4]*cf.* Dana M. Muir, *ERISA Remedies:*

---

[4]In *Held*, the plaintiff alleged that the defendants violated ERISA § 510 by coercing him to resign shortly before he had completed the ten years of service necessary for certain of his pension rights to vest. 912 F.2d at 1198. Although the majority in *Held* stated that the plaintiff had "two distinct causes of action," one of which was a claim under § 502(a)(1)(B) for "benefits due under the plan," *id.* at 1203-04, it is clear from both the majority's and the dissenting judge's discussion that the cause of action under § 502(a)(1)(B) was not to enforce rights under § 510, but was instead based on the plaintiff's allegation that he had actually accrued some pension rights that the defendants had failed to honor. *See id.* at 1203 n.7 (reading the complaint as potentially raising a "colorable claim to something less than '100% of accrued benefits' based on his employment of more than nine years"); *id.* at 1203-04 ("Admittedly, the parties' briefs emphasize Mr. Held's § 510 claim and give short shrift to the issue of Mr. Held's *separate claim* for benefits due under the plan.") (emphasis added); *id.* at 1207 (Ebel, J., dissenting) (disagreeing with "the majority's view that the plaintiff has filed a separate claim for benefits due him under the terms of the retirement plan" because, as he read the record, "it is clear that plaintiff's request for benefits is linked only to his discriminatory termination claim under section 510 of

18

*Chimera or Congressional Compromise?*, 81 Iowa L. Rev. 1, 39 & nn. 321-22 (1995) ("Many commentators and courts agree that Section 502(a)(3) ... provides the sole basis for suits alleging a violation of Section 510."). Decisions from at least one court appear to take the opposite view. *See Zimmerman v. Sloss Equip., Inc.*, 835 F. Supp. 1283, 1290 (D. Kan. Apr. 8, 1993) ("The remedies for a violation of ERISA § 510 are those set forth in ERISA § 502(a)(1)(B) and (a)(3)."); *Babich v. Unisys Corp.*, No. 92-1473, 1994 WL 167984, at *3 (D. Kan. 1994) ("the damages available to an ERISA § 510 plaintiff are found in ERISA's enforcement provision, § 502(a)(1)(B) and (a)(3)." (citing *Zimmerman* and *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 392-94 (3d Cir. 1988)).[5]

We agree with the Seventh Circuit's reasoning in *Tolle*, which follows from a straightforward reading of the statute. Subsection (a)(1)(B) provides remedies only against a defendant who has failed to comply with the terms of a benefits plan. It allows plaintiffs to collect benefits "due under the terms of the plan" or to enforce "rights under the terms of the plan." Here, the plaintiffs have alleged that the defendants interfered with their ability to become eligible for further benefits, not that the defendants have breached the terms of the plan itself. We therefore agree with the District

---

ERISA.").

[5]As we will explain, *infra* § III.A.2, our decision in *Cox v. Keystone Carbon*, 861 F.2d 390 (3d Cir. 1988) does not hold that § 502(a)(1)(B) provides relief for a claim under § 510 for interference with benefits.

Court that subsection (a)(1)(B) does not provide relief for the violation of ERISA that the plaintiffs have alleged, and, accordingly, summary judgment on the issue was proper.

2

The plaintiffs argue that this Court's decisions in *Cox v. Keystone Carbon Co.*, 861 F.2d 390 (3d Cir. 1988) ("*Cox I*") and *Cox v. Keystone Carbon Co.*, 894 F.2d 647 (3d Cir. 1990) ("*Cox II*"), and the Tenth Circuit's decision in *Adams v. Cyprus Amax Minerals Co.*, 149 F.3d 1156 (10th Cir. 1998), support a different result. In this they are mistaken.

The plaintiffs' principal argument appears to be that, although they have not alleged that the defendants violated the terms of the benefits plan, the District Court could nevertheless effectively create a violation of the plan through a decree ordering Lucent to adjust its pension records to treat the plaintiffs as if they had remained at Lucent until retirement. The plaintiffs contend that such an order would result in an immediate obligation on the part of the defendants to pay the plaintiffs money that was rendered "past due" by operation of the court's decree, thus entitling the plaintiffs to seek relief under subsection (a)(1)(B). This bootstrap approach finds no support in the decisions the plaintiffs cite.

The Tenth Circuit's opinion in *Adams* is inapposite, as the plaintiffs in that case alleged violations of the terms of a plan rather than interference with the attainment of benefits. The court in *Adams* was not asked to construct a violation of an order and then treat that violation as if it were a violation of the terms of a benefit plan. The court was simply asked to

construe the terms of the plan itself to determine whether the plaintiffs were eligible for the benefits they sought. 149 F.3d at 1158-62. Unlike the plaintiffs in this case, the plaintiffs in *Adams* alleged a violation of the terms of their former employer's plan and were thus clearly entitled to seek relief under ERISA § 502(a)(1)(B). Here, by contrast, the plaintiffs have alleged that the defendants interfered with their ability to become eligible for benefits, which, as the Seventh Circuit explained in *Tolle*, is not a proper basis for relief under § 502(a)(1)(B).

Although *Cox I* and *Cox II* involved claims under ERISA § 510, they are also unavailing as support for the plaintiffs' argument. In *Cox I*, this Court indicated in dictum that § 510 could be enforced through § 502(a)(1)(B) when an interference-with-benefits claim is alleged. 861 F.2d at 392-93. However, that appears to have been a proposition assumed by the parties and accepted by us without analysis or discussion. Moreover, we expressly declined to decide whether § 502(a)(1)(B) provided any relief to the plaintiff in that case. *Id*. at 394. Instead, we remanded for the district court to determine in the first instance "if Cox is entitled to relief pursuant to § 502(a)(1)(B), and if so, whether or not Cox is entitled to a jury trial on this claim." *Id.*

On remand, the district court held that Cox had stated a § 510 claim enforceable under § 502(a)(1)(B), but that he was not entitled to a jury trial and that he lost on the merits of that claim. Cox appealed, and we affirmed in *Cox II*. As in *Cox I*, the primary focus of our discussion was whether Cox was entitled to a jury trial. 894 F.2d at 649-50. We did not undertake any analysis of whether the district court had

21

correctly held that a claim under § 510 could be enforced under § 502(a)(1)(B).  The only comment we made that appears directly relevant to this issue undermines, rather than supports the plaintiffs' position in this case.  In disposing of Cox's arguments, we stated, "[t]o the extent that Cox seeks compensatory damages for tortious interference, that claim does not fall within section 502(a)(1)(B)."  894 F.2d at 650. Our decisions in *Cox I* and *Cox II* thus do not conflict with the Seventh Circuit's reasoning in *Tolle*, nor do they prevent us from adopting that reasoning in this case, as the District Court did.  Because we find that reasoning persuasive, we hold that a § 510 claim for interference with benefits is not enforceable under § 502(a)(1)(B).

## B

The District Court held that the plaintiffs were not entitled to "appropriate equitable relief" under ERISA § 502(a)(3) because they had waived their right to request equitable restitution or injunctive relief.  Alternatively, the District Court ruled that, even if the plaintiffs had not waived any of their rights with respect to a remedy, the relief they requested was not "appropriate equitable relief" within the meaning of the statute.  We agree on the latter point and, therefore, do not reach the question of waiver.

## 1

Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), provides:

A civil action may be brought—

(3) by a participant, beneficiary, or fiduciary
   (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or
   (B) to obtain *other appropriate equitable relief*
      (i) to redress such violations or
      (ii) to enforce any provisions of this subchapter or the terms of the plan;

(emphasis added). The Supreme Court has held that the phrase "appropriate equitable relief" means only "those categories of relief that were *typically* available in equity" in the days of the divided bench, *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993) (original emphasis)). According to the Supreme Court, such relief includes "injunction, mandamus, and restitution, but not compensatory damages." *Mertens*, 508 U.S. at 256. Thus, a plaintiff seeking relief under ERISA § 502(a)(3) must tie that request to a form of relief typically available in equity. In *Great-West*, the Court suggested that "the basic contours of the term [equitable relief] are well known," and can be understood by consulting "standard current works such as Dobbs, Palmer, Corbin, and the Restatements, which make the answer clear." 534 U.S. at 217; *see also Sereboff v. Mid Atl. Med. Servs., Inc.*, 126 S. Ct. 1869, 1875-76 (2006) (referring to Dobbs, Palmer, and *Pomeroy's Equity*

23

*Jurisprudence* to explain the contours of the right to an equitable lien).

As earlier noted, the plaintiffs sought a decree from the District Court requiring Lucent to adjust its pension records retroactively to create an obligation to pay the plaintiffs more money, both in the past and going forward. The District Court rightly saw this as being, in essence, a request for compensatory damages merely framed as an "equitable" injunction. The Court thus rightly concluded that the requested relief is not available under § 502(a)(3).[6] *Great-West*, 534 U.S. at 210; *Mertens*, 508 U.S. at 255 (1993); *see also Bowen v. Massachusetts*, 487 U.S. 879, 915-16 (1988)

---

[6]This is not to say that an ERISA plaintiff's demand for money necessarily requires the conclusion that the relief sought is not "equitable" within the meaning of the statute. The Supreme Court has explained that some forms of equitable relief—such as constructive trusts, equitable liens, or accounting for the profits derived from wrongly held property—include the payment of money. *Great-West*, 534 U.S. 213-14 & n.2. As the Court explained in *Great-West*, however, these forms of relief are available in limited circumstances. "Almost invariably, suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." *Id.* at 210 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 918-19 (1988) (Scalia, J., dissenting)).

24

(Scalia, J., dissenting) ("It does not take much lawyerly inventiveness to convert a claim for payment of a past due sum (damages) into a prayer for an injunction against refusing to pay the sum, or for a declaration that the sum must be paid, or for an order reversing the agency's decision not to pay.").

2

The plaintiffs argue that the relief they seek is indistinguishable from the relief approved by the Supreme Court in *Varity Corp. v. Howe*, 516 U.S. 489 (1996), and, therefore, *Varity* and this Court's decisions in *Cox I* and *Cox II*, as well as the Tenth Circuit's decision in *Adams*, compel a different result.  Once again, we disagree.

In *Varity*, the defendant corporation deceived several of its employees into transferring their jobs and their benefit plans from a profitable subsidiary to another subsidiary that had been set up to fail.  *Id.* at 493-94.  The trial court found that the defendant had violated its obligation as a fiduciary to operate its benefits plan "solely in the interest of the participants and beneficiaries" of the plan, and issued an order—citing ERISA § 502(a)(3) as its source of authority—directing the corporation to reinstate the transferred employees back into the benefits plan of the profitable subsidiary.  *Id.* at 494-95.  *Varity* is distinguishable from the present case for at least two reasons.

First, the plaintiffs in *Varity* were deceived into transferring from one subsidiary to another within the same company, and thus the relief in that case was measurable

25

according to the defendants' gain, rather than the plaintiffs' loss. *LaRue v. DeWolff, Boberg & Assocs.*, 450 F.3d 570, 576 (4th Cir. 2006) (holding that a plaintiff could not recover under ERISA § 502(a)(3) where he alleged that he lost money because his 401(k) plan administrator had failed to follow his directions for making changes to his investment, noting that the plaintiff "gauges his recovery not by the value of defendants' nonexistent gain, but by the value of his own loss—a measure that is traditionally legal, not equitable"); *Millsap*, 368 F.3d at 1253 (holding, in a § 510 case involving a plant closing, that back pay was not "appropriate equitable relief" because it measured the plaintiffs' loss rather than the defendants' gain). In *Varity*, the plaintiffs sought pension benefits for work they had actually done for their employer, and the court's decree was a matter of restoring the plaintiffs' benefits enrollment to the preexisting arrangement, thus undoing the effects of the defendants' deception. Here, however, the plaintiffs are seeking pension benefits for work they never did for AT&T or its former divisions, but which they argue they might have done had AT&T not adopted a hiring policy that they claim violated ERISA. The remedy they seek is thus akin to "back pay," which is not an equitable remedy within the meaning of the statute. *Great-West*, 534 U.S. at 218 n.4; *see also Millsap*, 368 F.3d at 1253 ("[P]aying backpay damages is like paying an extra worker who never came to work." (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 229 (1982))); *id.* at 1254 ("Plaintiffs' proposed method of calculating their backpay award is based on each individual class member's loss rather than Defendant's gain ... [and] is thus in the nature of compensatory damages."); 2 Dan B. Dobbs, *Law of Remedies* § 6.10(5) at 226 (2d ed. 1993)

26

("Back pay claims do not differ remedially from the personal injury claim for lost wages, or the contract claim for past wages due, for example ... [s]o, while reinstatement is clearly equitable as a form of injunctive relief, back pay seems to be just as clearly legal.") (footnotes omitted).

Second, the Court in *Varity* did not rule on the question of whether the relief sought was "equitable" within the meaning of the statute, because the defendants stipulated that it was. 516 U.S. at 508 ("Varity *concedes* that the plaintiffs satisfy most of this provision's requirements, namely, that the plaintiffs are plan 'participants' or 'beneficiaries,' *and that they are suing for 'equitable' relief to 'redress' a violation of § 404(a)*, which is a 'provision of this title.'"(emphasis added)); *see also Great-West*, 534 U.S. at 221 n.5 ("In *Varity* ... it was undisputed that the respondents were seeking equitable relief ..." (emphasis omitted).

*Cox I* and *Cox II* are also unavailing as support for the plaintiffs' position. It is true that those decisions addressed whether there is a right to a jury trial in actions under ERISA § 502(a)(1)(B), and that ultimately we decided there is not, because such actions are analogous to actions for breach of trust, which were typically heard in courts of equity. *See Cox II*, 894 F.2d at 649 (citing *Turner v. CF & I Steel Corp.*, 770 F.2d 43 (3d Cir. 1985)). It does not follow, however, that all relief available for a breach of trust at common law is "equitable relief" within the meaning of § 502(a)(3) of ERISA. The Supreme Court explicitly rejected that argument in *Mertens*. 508 U.S. at 258 (holding that the term "equitable

27

relief" in § 502(a)(3) does not mean "all relief available for breach of trust at common law").

Neither does *Adams* require a result contrary to our decision here. In the context of determining whether the plaintiffs in that case were entitled to a jury trial on their claims, the Tenth Circuit explained that the recovery of benefits due under the terms of a plan is analogous to equitable restitution. 149 F.3d at 1162. As discussed above, however, the plaintiffs are not seeking benefits that were wrongly withheld for work they performed for the defendants. Rather, they are seeking an award of benefits as an approximation of the loss they suffered as a result of what they say is the defendants' violation of § 510 of ERISA. As the Supreme Court explained in *Great-West*, this amounts to a claim for *legal* damages, not *equitable* restitution, and thus is relief not available to the plaintiffs in this case. 534 U.S. at 213-14 (explaining the difference between legal and equitable relief); *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 210-12 (3d Cir. 2004) (same).

We therefore agree with the District Court that the relief the plaintiffs sought is not "equitable" within the meaning of ERISA § 502(a)(3).

C

Finally, the plaintiffs argue that the District Court's grant of summary judgment is contrary to the mandate of this Court, and that its reading of § 502 would render § 510 of

28

ERISA without effect. Both of those arguments are without merit.

A district court must "implement both the letter and spirit of the mandate" it receives from this Court, but district courts are free to "consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision." *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949-50 (3d Cir. 1985) (citing cases). We held in the previous appeal that the plaintiffs had presented sufficient evidence to survive a summary judgment motion that argued the defendants lacked any intent to interfere with the plaintiffs' pension benefits. We neither explicitly nor implicitly ruled on the question of whether any of the relief the plaintiffs sought was available under § 502, and that issue was therefore open for the District Court to address on remand.

The plaintiffs argue, however, that the defendants' failure to raise the issue of whether § 502 afforded the plaintiffs any relief resulted in a waiver of that issue. For that proposition, they rely on our decision in *Skretvedt*. In *Skretvedt*, the plaintiff filed an eight-count complaint, the District Court granted summary judgment to the defendants on all eight counts, and the plaintiff only appealed as to two of the eight counts. 372 F.3d at 197-99. The plaintiff won a remand on appeal and then sought to relitigate on remand some of the remaining six counts for which he had not secured a remand. *Id.* at 199. We held that the plaintiff had waived any right to recover on those claims by not challenging the District Court's grant of summary judgment

on those claims in the first appeal. The panel stated that "[w]e have consistently rejected such attempts to litigate on remand issues that were not raised *in a party's prior appeal* and that were not explicitly or implicitly remanded for further proceedings." *Id.* at 203 (emphasis added); *see also Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 88 (3d Cir. 1987) ("An issue that is not addressed in *an appellant's brief* is deemed waived on appeal.") (emphasis added).

Here, however, the defendants were the *appellees* in the previous appeal. As such, they were not required to raise all possible alternative grounds for affirmance to avoid waiving those grounds. *See Kessler v. Nat'l Enters., Inc.*, 203 F.3d 1058, 1059 (8th Cir. 2000) ("[A]ppellate courts should not enforce the [waiver] rule punitively against appellees, because that would motivate appellees to raise every possible alternative ground and to file every conceivable protective cross-appeal, thereby needlessly increasing the scope and complexity of initial appeals."); *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 741 (D.C. Cir. 1995) ("[F]ull application of the waiver rule to an appellee puts it in a dilemma between procedural disadvantage and improper use of the cross-appeal, [and t]hat dilemma, together with the potential judicial *dis*economies of forcing appellees to multiply the number of arguments presented, justifies a degree of leniency in applying the waiver rule to issues that could have been raised by appellees on previous appeals.") (original emphasis).

We also reject the plaintiffs' argument that the District Court's construction of § 502(a) renders § 510 ineffective. As

30

the Supreme Court has noted, the "prototypical" claim under § 510 of ERISA is when an employer terminates an employee to prevent his pension rights from vesting. *Ingersoll-Rand*, 498 U.S. at 143. Under such circumstances, the typical remedy is reinstatement, which is an equitable remedy within the terms of the statute. 2 Dobbs § 6.10(5) at 226. It may be that § 502(a) restricts the scope of § 510 as a practical matter by leaving without remedy some violations of § 510 that differ from the "prototypical" case. That the plaintiffs are without a remedy in this case, however, does not render § 510 ineffective in all cases, and thus does not implicate the canon of statutory interpretation that cautions against interpreting a statute so as to render one part inoperative. *See generally United States v. Menasche*, 348 U.S. 528, 538 (1955).

IV

For the foregoing reasons, we will affirm the judgment of the District Court.

31